UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DALRADA PRECISION CORP., et al., Plaintiffs, v. STUART COX, Defendant. | Case No.: 24-cv-1122-AJB-DEB **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** **(Doc. No. 140)** |

Defendant Stuart Cox ("Defendant"), appearing *pro se*, has filed a motion to dismiss Plaintiffs' First Amended Complaint ("FAC"). (Doc. No. 140.) Plaintiffs filed an opposition (Doc. No. 142), and Defendant replied (Doc. No. 144). For the reasons stated herein, the Motion to Dismiss is **GRANTED.**

## I. BACKGROUND

Defendant currently resides in the Republic of the Philippines.[1] (Doc. No. 129 ¶ 8.) Plaintiff Dalrada Precision Corp. ("Dalrada Precision") is a California Corporation with its principal place of business in Escondido, California. (*Id.* ¶ 6.) Plaintiff Dalrada Financial

[1] It is unclear whether Defendant is a citizen of the United Kingdom or the Republic of the Philippines. (*Compare* Doc. No. 129 ¶¶ 2, 8 (stating that Defendant is a citizen of the Philippines), *with* Doc. No. 140 at 9 (providing that "Defendant remained a UK resident"). However, it is undisputed that Defendant currently resides in the Philippines.

Corporation ("Dalrada Financial") is a Wyoming Corporation with its principal place of business also in Escondido, California. (*Id.* ¶ 7.) Plaintiffs allege that "[a]ll transactions subject to this Complaint have taken place in the United States, State of California," and "[u]pon information and belief, Defendant Cox has had regular, continuous, and ongoing contact with this jurisdiction." (*Id.* ¶¶ 9, 10.)

In June 2019, Defendant was the sole owner/shareholder of Likido Limited ("Likido"), a United Kingdom company with a physical plant location in Edinburgh, Scotland. (*Id.* ¶ 13.) Likido produces and manufactures a commercial heat pump device designed to conserve energy and lower utility costs. (*Id.* ¶ 14.)

Plaintiffs and Defendant entered into a Stock Purchase Agreement in December 2019, whereby Defendant effectively transferred ownership of Likido to Plaintiffs. (*Id.* ¶ 15; *see also* Doc. No. 129-2, Ex. A.) Plaintiffs agreed to purchase 100% of Defendant's share certificates in exchange for his Six Million One Hundred Eighteen Thousand ($6,118,000.00) common equity shares in Dalrada Financial. (Doc. No. 129 ¶ 16.) Under the Stock Purchase Agreement, liabilities also transferred from Defendant to Plaintiffs. (*Id.* ¶ 28.) Plaintiffs state that this Stock Purchase Agreement is not "part of this action." (*Id.* ¶ 15.) Additionally, Plaintiffs provided Defendant a "Consultant Agreement," under which Plaintiffs agreed to pay Defendant a guaranteed salary of £60,000.00 (approximately $74,442.00) over a period of thirty-six months. (*Id.* ¶ 17, Ex. B.) The Consultant Agreement contains a forum selection clause providing that any action to enforce the Consultant Agreement "shall be brought in any state or federal court located in the State of California, San Diego County." (*Id.*, Ex. B ¶ 11.) Plaintiffs do not allege a breach of the Consultant Agreement, nor does the Consultant Agreement serve as a basis for any of the alleged causes of action.

Prior to entering into the Stock Purchase Agreement with Plaintiffs, Defendant agreed to sell to MAPtech, a South Carolina company that is not a party to this action, industrial chilling systems manufactured by Likido for $429,987.98. (*Id.* ¶¶ 21–23.) MAPtech sent the funds to Defendant's personal bank account, but MAPtech never

received the Likido industrial chilling systems. (*Id.* ¶¶ 22–23.) Plaintiffs allege that Defendant "had absolutely no ability to perform his part of the agreement [with MAPtech]" but nevertheless priced the MAPtech contract into Likido's value during his negotiations with Plaintiffs over the Stock Purchase Agreement. (*Id.* ¶¶ 23–24.) According to the FAC, Defendant "failed to inform Plaintiffs [prior to entering into the Stock Purchase Agreement] . . . that he had already received the payment for the order of the chillers, had pocketed the money, and was now unable to deliver on his promise to manufacture the units for MAPtech." (*Id.* ¶ 25.) Plaintiffs also allege that "Defendant refused to provide any access to the Likido bank accounts preventing Plaintiffs from having any visibility whatsoever to what was occurring with the funds being sent from Plaintiffs' California bank account to the [Likido] bank account in an effort to further conceal his fraudulent activities." (*Id.* ¶ 31.)

After Likido failed to produce and deliver the chilling units, MAPtech filed a Notice of Arbitration in the United Kingdom alleging conversion, fraudulent misrepresentation, breach of contract, and unjust enrichment. (*Id.* ¶ 27.) On January 10, 2023, the Arbitrator issued its award in favor of MAPtech in the amount of $429,987.98, including interest. (*Id.* ¶¶ 28–29.) Because Plaintiffs assumed Likido's liabilities pursuant to the Stock Purchase Agreement, this award became Plaintiffs' liability. (*Id.*)

Plaintiffs allege that beginning in May 2022, Defendant's behavior became "unpredictable and bizarre." (*Id.* ¶ 33.) According to the FAC, Defendant sent "threatening and, at times, vulgar" emails to Climagal, a potential customer. (*Id.* ¶ 34.) Plaintiffs then determined that Defendant's employment with Plaintiffs needed to end. (*Id.* ¶ 36.) Plaintiffs offered Defendant a six-month paid leave with any future relationship to be discussed after the leave. (*Id.*) Defendant's leave, and associated payments to him, ceased on February 18, 2023. (*Id.* ¶ 31.) Plaintiffs allege that "Defendant basically informed [Plaintiffs] that they needed to continue making payments to him or he would ruin them." (*Id.* ¶ 39.) Plaintiffs also contend that Defendant contacted some of Plaintiffs' employees located outside of

California, slandered Plaintiffs to these employees, and attempted to coax the employees into working for Defendant. (*Id.* ¶ 40.)

Plaintiffs now bring the instant action alleging seven causes of action: (1) fraudulent misrepresentation, (2) fraudulent concealment, (3) fraudulent inducement, (4) unjust enrichment, (5) injunctive relief, (6) defamation, and (7) violations of California's Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200–17207.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(2)

An action is subject to dismissal if the Court lacks personal jurisdiction over defendant. *See* Fed. R. Civ. P. 12(b)(2). Where there is no federal statute applicable to determine personal jurisdiction, a district court should apply the personal jurisdiction law of the state where the federal court sits. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). California law requires only that the exercise of personal jurisdiction comply with federal due process requirements. *See id.* at 800–01.

Personal jurisdiction may be either general or specific. *See Picot v. Weston*, 780 F.3d 1206, 1211; *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141–42 (9th Cir. 2017); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8–9 (1984). "General jurisdiction exists when a defendant is domiciled in the forum state or his activities there are 'substantial' or 'continuous and systematic.'" *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998) (quoting *Helicopteros*, 466 U.S. at 414–16). Even if a defendant has not had continuous and systematic contacts with the state sufficient to confer general jurisdiction, a court may exercise specific jurisdiction over the defendant. *Picot*, 780 F.3d at 1211. Specific jurisdiction exists where the claim for relief arises directly from a defendant's contacts with the forum state. *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

In the face of a 12(b)(2) motion, "the plaintiff bears the burden of demonstrating that the court has jurisdiction." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013). "Personal jurisdiction must exist for each claim asserted against

a defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citing *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1289 n. 8 (9th Cir. 1977)).

**B. Leave to Amend**

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. *See Desoto*, 957 F.2d at 658; *Schreiber*, 806 F.2d at 1401.

**III. DISCUSSION**

**A. Personal Jurisdiction**

Absent traditional bases for personal jurisdiction (physical presence, domicile, or consent), due process requires that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). To establish minimum contacts, the court relies on the *Dole* factors: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). The minimum contacts inquiry "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," and "it is the defendant's conduct that must form the necessary connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 285 (2014); *see also Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017).

Defendant moves to dismiss the FAC, in its entirety, arguing that this Court lacks personal jurisdiction over him. (*See* Doc. No. 140.) Defendant contends that the California "job offer was never performed," "Defendant remained a UK resident," and "there were no 'suit-related' activities performed by the Defendant in California." (*Id.* at 9.)

Plaintiffs oppose the motion arguing that Defendant "purposefully availed" himself of California by: (1) acting as an executive and manager of Likido, which was funded and controlled exclusively by a California corporation; (2) traveling to California for business meetings related to corporate strategy and operations; (3) performing work on U.S.-based projects under a Consultant Agreement contemplating California jurisdiction; (4) receiving payroll, operating funds, and financial support from California banking institutions; (5) communicating regularly with California-based executives and stakeholders; and (6) engaging in conduct directed at and harming a California company. Plaintiffs allege the claims asserted arise directly from Defendant's conduct performed while acting as an executive and manager for Plaintiff's operations which are funded and controlled from California. Plaintiffs contend Defendant's misconduct occurred within the scope of his relationship with Plaintiffs and while interacting with California-based executives and resources. The Court disagrees.

Here, it is undisputed that Defendant does not reside in California. (*See* Doc. No. 129 at ¶¶ 2, 8.) Thus, the Court analyzes whether Defendant has minimum contacts with California such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice. *See International Shoe*, 326 U.S. at 316. Because personal jurisdiction must exist for each claim asserted, *see Action Embroidery*, 368 F.3d at 1180, the Court separately analyzes personal jurisdiction for each claim asserted.

Plaintiffs' claims arise from two distinct categories of conduct. First, Plaintiffs allege Defendant fraudulently induced them into entering the Stock Purchase Agreement by misrepresenting Likido's financial condition and concealing liabilities associated with MAPtech. Although Plaintiffs contend the Stock Purchase Agreement is not "part of this action," the basis of several of Plaintiffs' causes of action are exclusively predicated on

Defendant's representations related to the Stock Purchase Agreement. According to the FAC, Defendant represented that Likido possessed valuable pending purchase orders, including the profitable contract with MAPtech. The FAC alleges that the assets associated with those agreements would transfer to Plaintiffs as part of the acquisition. But as it relates to the MAPtech contract, because MAPtech paid Defendant directly, Plaintiffs never received those funds. And Plaintiffs allege Defendant never disclosed the receipt of those funds. Plaintiffs further allege that, after Plaintiffs purchased Likido, MAPtech initiated arbitration proceedings arising from Defendant's conduct, ultimately resulting in an arbitration award that Plaintiffs became obligated to satisfy. Plaintiffs contend that Defendant concealed these liabilities and intentionally misrepresented Likido's value in order to induce Plaintiffs into executing the Stock Purchase Agreement.

Second, Plaintiffs allege that following the dispute related to the MAPtech liabilities and Defendant's separation from the company, Defendant embarked on a campaign of harassment and defamation directed toward Plaintiffs and their employees. Plaintiffs allege that Defendant threatened to use his shares of Dalrada Financial stock to "destroy" Plaintiffs and harm future public relations announcements unless Plaintiffs continued making payments to him. Plaintiffs further allege that Defendant made disparaging and defamatory remarks to employees and business contacts. According to the FAC, Defendant referred to Plaintiffs and their personnel using derogatory language, attempted to lure employees away from Plaintiffs, and posted false and damaging statements on LinkedIn and other social media platforms. Plaintiffs allege these statements harmed their reputation, business relationships, and prospective economic opportunities. The Court first addresses whether this Court has personal jurisdiction over Defendant for the claims related to the Stock Purchase Agreement. The Court then turns to the defamation-related claims.

### 1. Claims Related to the Stock Purchase Agreement

Under the first prong of the specific jurisdiction analysis, Plaintiffs must establish that Defendant "either purposefully availed [himself] of the privilege of conducting activities in California, or purposefully directed [his] activities toward California."

*Schwarzenegger*, 374 F.3d at 802. Courts have interpreted "purposeful availment" and "purposeful direction" as distinct concepts. The purposeful direction analysis is generally used for claims sounding in tort, while the purposeful availment analysis is used for claims sounding in contract. *Picot*, 780 F.3d at 1212. Here, each of Plaintiffs' causes of action sound in tort, thus the Court must determine whether Defendant purposefully directed his activities toward California.

Courts in the Ninth Circuit analyze purposeful direction under the three-part "effects test" from the Supreme Court's opinion in *Calder v. Jones*, 465 U.S. 783, 787–89 (1984). *See Schwarzenegger*, 374 F.3d at 803. "Under this test, the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (internal quotation marks and citation omitted) *abrogated on other grounds as recognized by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017). "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (quoting *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995)). A plaintiff must show "something more" than just "a mere foreseeable effect" to justify the assertion of specific jurisdiction. *Id.* at 1156.

It cannot be said that Plaintiffs' "claim[s] for relief arise[] directly from [Defendant's] contacts with the forum state." *AT&T*, 94 F.3d at 588. None of the conduct Plaintiffs argue establish jurisdiction over Defendant—Defendants' travels to California; Defendant's work under the Consultant Agreement; Defendant receiving payroll, operating funds, and financial support from California banking institutions; or Defendant's communications with California-based executives and stakeholders—relate to the causes of action for intentional misrepresentation, fraudulent concealment, fraud in the Inducement, unjust enrichment, or injunctive relief. Rather, each of these causes of action are based on allegations that Defendant, a nonresident, negotiated and executed a Stock

Purchase Agreement with Plaintiffs concerning the acquisition of a foreign entity, Likido. Plaintiffs allege Defendant misrepresented the liabilities and contractual obligations related to MAPtech. However, the FAC does not allege that the Stock Purchase Agreement was negotiated, executed, or was to be performed in California. Nor does the FAC allege that the misrepresentations concerning MAPtech were expressly directed toward California in a manner sufficient to constitute purposeful direction. Rather, the allegations concern Defendant's conduct related to a foreign company, transactions occurring outside California, alleged misrepresentations made outside of California, and an arbitration award that resulted from an arbitration in a foreign country.

In short, as it relates to the fraud-based claims, Plaintiffs have not made a prima facie showing that Defendant purposefully directed his activities toward California. Thus, the first prong of the specific jurisdiction test fails. Because Plaintiffs fail to satisfy their burden under the first prong of the specific jurisdiction test, precluding the Court from exercising specific jurisdiction over Defendant, the Court need not address the other two prongs of that test. *See Schwarzenegger*, 374 F.3d at 802 (holding that "[i]f the plaintiff fails to satisfy either of [the first or second] prongs, personal jurisdiction is not established in the forum state").

Because Plaintiffs fail to allege adequate forum-related conduct connecting Defendant's alleged misrepresentations and concealment to California, the Court lacks specific personal jurisdiction over Defendant as to the causes of action arising from the Stock Purchase Agreement and the MAPtech-related allegations. Plaintiffs cannot recover damages arising from the MAPtech arbitration award or liabilities imposed through that arbitration in this action because those alleged damages arise from claims over which this Court lacks personal jurisdiction over Defendant. Accordingly, the Motion to Dismiss as to Plaintiffs' claims for Fraud (Intentional Misrepresentation), Fraudulent Concealment, Fraud in the Inducement, Unjust Enrichment, and Injunctive Relief (Claims 1–5) is **GRANTED**.

### 2. Defamation Related Claims

The Court now turns to Plaintiffs' claims for Defamation (Claim 6) and Violation of California's UCL (Claim 7). These claims arise from Defendant's alleged campaign of disparagement, harassment, and threats directed toward Plaintiffs, their employees, and business associates. The Court addresses these allegations as two distinct categories of conduct. First, the allegedly defamatory text messages and emails Defendant sent to Anthony Pagnotti, Brian McGoff, Kyle McCollum, and Stéphane Moya.[2] Second, the social media posts which Plaintiffs allege constitute a "campaign of public defamation."

As discussed above, because these claims sound in tort, Plaintiffs must allege that Defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Picot*, 780 F.3d at 1212. The "expressly aimed" analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. Simply put, "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Janus v. Freeman*, 840 F. App'x 928, 930 (9th Cir. 2020) (citation omitted). Thus, to satisfy the purposeful direction test, Plaintiffs must show that Defendant "expressly aim[ed]" conduct at California. *Pebble Beach*, 453 F.3d at 1156. Plaintiffs fail to do so.

#### a. Text Messages and E-mails

The FAC alleges that Defendant made defamatory private statements by text and email to Anthony Pagnotti, Brian McGoff, Kyle McCollum, and Stéphane Moya. (Doc. No. 129 ¶ 87.) It further alleges that Pagnotti is a Pennsylvania resident. (*Id.* ¶ 40.)

---

[2] The Court notes that the FAC erroneously identifies Mr. Moya as "Stephanie." (*See* Doc. No. 129 ¶¶ 34, 87; *see also* Doc. No. 129-1, Ex. L).

Plaintiffs do not allege that any of the recipients of any of the communications were California residents or located in California when they received the messages.[3]

That omission is significant. Under *Walden*, it is not enough that Plaintiffs are California-based or that they experienced reputational or economic injury in California; the relevant inquiry is whether Defendant's own communications created contacts with California. *See Walden*, 571 U.S. at 289–90. In *Walden*, the Supreme Court stressed that, even where an intentional tort is alleged, the "defendant's suit-related conduct must create a substantial connection with the forum State," and this "relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. at 277 (emphasis in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Furthermore, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* at 1122. Thus, even where the *Calder* test is invoked, a "forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum," and the specific jurisdiction analysis must focus on the "relationship among the defendant, the forum, and the litigation." *Id.* at 1123. The Court emphasized that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in any meaningful way." *Id.* at 1125.

The private communications here do not satisfy the "express aiming" requirement. The FAC does not allege that Defendant sent the texts or emails into California, that the recipients were in California, or that the communications were designed to reach a California audience. Even if some messages concerned Plaintiffs, a California company,

[3] Based on the emails attached to the FAC, it appears that Stéphane Moya is a resident of either France or Spain. (*See* Doc. No. 129-1 at 131 (the country codes associated with Stéphane Moya's phone numbers are +33 and +34, the country codes for France and Spain, respectively).)

or were received by company personnel connected to California, the Supreme Court requires more than a showing that a California plaintiff felt the impact of out-of-state speech. *See Walden*, 571 U.S. at 289–90. Accordingly, as to the text messages and emails, the FAC falls short of alleging personal jurisdiction over Defendant.

**b. Social Media Posts**

As it relates to the allegedly defamatory and disparaging social media posts, it is a closer call. But the Court determines these posts are not sufficient to establish personal jurisdiction over Defendant.

"[S]ocial media and internet-based activities present a unique context for assessing personal jurisdiction under *Calder*." *Moore v. Cecil*, 109 F.4th 1352, 1363 (11th Cir. 2024). Neither party cites controlling Ninth Circuit precedent addressing the application of the *Calder* effects test in the social media context, and the Court finds none. However, the Ninth Circuit's unpublished memorandum disposition in *Janus v. Freeman*, 840 F. App'x 928 (9th Cir. 2020) is instructive.

In *Janus*, the plaintiff, a California resident, sued Freeman, a Texas resident, in the Central District of California. *Id*. at 929. Freeman began posting allegedly defamatory material about Janus and his business, 17hats, on social media after Freeman's wife began working at Janus's company in California and began a romantic relationship with Janus. *Id*. at 932. Specifically, Freeman contacted 17hats' Director of Operations, pretending to be interested in a job, and sent messages over Facebook Messenger accusing Janus of using his company as a "personal matchmaking service." *Id*. at 933. These messages were visible to several employees. *Id*. On another occasion, Freeman allegedly posted a comment to a livestream that was viewed by 17hats' employees and customers. *Id*. at 933. Freeman also made accusations to his estranged wife that Janus was being criminally investigated and had previously been accused of crimes. *Id*.

Applying *Walden*, the majority affirmed the district court's dismissal for lack of jurisdiction, stating that "the mere making of defamatory comments to persons known to be Californians is not sufficient, without more, to establish purposeful direction under

*Walden*. What matters is the creation of "reputation-based effects" within California . . . and Janus's showing on this score is essentially nonexistent." *Id*. at 931.

Other circuits have similarly addressed social media and internet-based activities post-*Walden*. In *Moore*, the Eleventh Circuit opined that other circuits "have uniformly held that in determining whether the allegedly defamatory comments or information was directly aimed at the forum, the court must look to the defendant's focus, purpose, and/or intent in posting the information." *Id.*

The Fourth Circuit held that the application of *Calder* in the internet context "requires proof that the out-of-state defendant's [i]nternet activity is expressly targeted at or directed to the forum state"—i.e., did the defendant "manifest an intent" to direct its internet content to an audience in the forum state. *Young v. New Haven Advocate*, 315 F.3d 256, 262–63 (4th Cir. 2002). Mere knowledge that the effects of the defendant's conduct would be felt in the forum state, without more, is insufficient. *Id.* In *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314 (5th Cir. 2021), the Fifth Circuit noted that "[t]he key question, under *Calder*, is whether the forum state was the focal point both of the [alleged defamation] and of the harm suffered." *Johnson*, 21 F.4th at 318 (quotations omitted). And the Eight Circuit held that a Colorado defendant who posted an allegedly defamatory statement online about the Missouri plaintiff's business "does not create the type of substantial connection between [the defendant] and Missouri necessary to confer specific personal jurisdiction." *Johnson v. Arden*, 614 F.3d 785, 797 (8th Cir. 2010).

The Tenth Circuit addressed the issue in *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008); *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956 (10th Cir. 2022); and *Shrader v. Biddinger*, 633 F.3d 1235 (10th Cir. 2011). *See Dudnikov*, 514 F.3d at 1077 ("[U]nder the *Calder* test[,] plaintiffs . . . must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook *intentional actions that were expressly aimed at that forum state*." (emphasis in original)); *see also Eighteen Seventy*, 32 F.4th at 972 (explaining that the second prong of *Calder* effects test focuses "on whether the

defendant's allegedly tortious conduct was focused on or directed at the forum state—not . . . on whether the defendant's wrongful conduct was focused on or directed at the interests of plaintiffs who reside in or otherwise have significant connections to the forum state"); *Shrader*, 633 F.3d at 1241 (explaining that in the internet context when determining whether the defamatory information was aimed at the forum state, courts must look for "indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state").

Thus, where there is no evidence that the defendant posted the allegedly defamatory information hoping to reach the forum state or an audience in the forum state specifically, the *Calder* effects test is not satisfied. *See, e.g.*, *Blessing v. Chandrasekhar*, 988 F.3d 889, 906–07 (6th Cir. 2021) (holding that the court lacked personal jurisdiction where "[t]here [was] no evidence that the defendants posted the tweets hoping to reach [the forum state] specifically as opposed to their Twitter followers generally"); *Herman v. Cataphora, Inc.*, 730 F.3d 460, 466 (5th Cir. 2013) (holding that personal jurisdiction did not exist because, while the plaintiffs demonstrated that the harm caused by the allegedly defamatory statements would be felt in the forum state of Louisiana, they failed to show "that the statements' focal point was Louisiana" and there was no evidence that the statements were directed at Louisiana residents or that the website had a "disproportionately high Louisiana readership").

Applying these principles to the instant case, to satisfy the *Calder* effects test for personal jurisdiction, Plaintiffs need to show that California was the focal point of Defendant's social media posts. Plaintiffs fail to do so.

Here, Plaintiffs allege only that Defendant posted defamatory statements on LinkedIn and other social media platforms, and that those statements harmed Plaintiffs' reputation and business opportunities in California and elsewhere. However, the FAC is conclusory and does not clearly allege facts showing that the posts were specifically targeted at California. Indeed, in reviewing the posts at issue (Doc. No. 129-1 at 150–57,

Ex. P), there is no evidence that California was the focal point of the alleged defamation. The LinkedIn posts were not directed at California readers nor were California customers targeted, as opposed to a national audience generally. Finally, no California residents or business were tagged in any of the posts. Merely mentioning a California business in a social media post is insufficient to establish Defendant's conduct as being expressly aimed at California. Plaintiffs have not shown "something more" than just "a mere foreseeable effect" to justify the assertion of specific jurisdiction. The allegation that the posts were public, standing alone, is insufficient. Accordingly, these allegations are insufficient to establish personal jurisdiction over Defendant. Defendant's Motion to Dismiss as to Plaintiffs' defamation and UCL claims is **GRANTED**.

### B. Leave to Amend

As to the claims premised on the misrepresentations related to the Stock Purchase Agreement, the Court finds amendment would be futile. Because Plaintiffs cannot cure the deficiency by amendment, these claims are **DISMISSED without leave to amend**. *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018) ("Leave to amend may be denied if the proposed amendment is futile or would be subject to dismissal."). However, as it relates to the defamation and UCL claims, the Court finds that Plaintiffs may be able cure the defects described above by pleading additional facts to establish personal jurisdiction over Defendant. Accordingly, these claims are **DISMISSED with leave to amend**.[4]

## IV. CONCLUSION

For the forgoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss under Rule 12(b)(2). The Court **ORDERS** as follows:

---

[4] The Court notes that Plaintiffs did not seek leave to amend in their Opposition. (*See* Doc. No. 142.) However, given the Ninth Circuit's liberal policy favoring amendments, the Court will allow Plaintiffs leave to amend these claims. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

1. Plaintiffs' claims for fraudulent misrepresentation, fraudulent concealment, fraudulent inducement, unjust enrichment, injunctive relief (Claims 1–5) are dismissed **without leave to amend**.

2. Plaintiffs' defamation and UCL claims (Claims 6 and 7) are dismissed **with leave to amend**.

3. Should Plaintiffs choose to do so, they may file a Second Amended Complaint no later than **September 9, 2026**. Any amended complaint must cure the deficiencies outlined in this order and must not re-allege the claims dismissed without leave to amend. Because Plaintiffs have already been afforded one opportunity to amend, this will be their final opportunity to establish personal jurisdiction over Defendant.[5]

4. Failure to timely file an amended complaint will result in this action be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(b).

5. If Plaintiffs file an amended complaint, Defendant must file a responsive pleading no later than **September 30, 2026**.

**IT IS SO ORDERED.**

Dated: August 26, 2026

Hon. Anthony J. Battaglia
United States District Judge

[5] *See Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016) ("[W]hen the district court has already afforded a plaintiff an opportunity to amend the complaint, it has wide discretion in granting or refusing leave to amend after the first amendment, and only upon gross abuse will [its] rulings be disturbed.") (alteration in original) (cleaned up); *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (noting district court's discretion is "particularly broad" when it has already granted a plaintiff leave to amend). *World Wide Rush, LLC v. City of L.A.*, 606 F.3d 676, 690 (9th Cir. 2010) (holding that a "district court's discretion to deny leave to amend is broad where a Plaintiff previously has amended complaint").